Filed 6/28/16  P. v. Orozco CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040211 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CC897123) |
| v. | |
| JUAN IGNACIO OROZCO, | |
| Defendant and Appellant. | |

A jury found defendant Juan Ignacio Orozco guilty of one count of aggravated sexual assault of a child (Pen. Code, §§ 269, subd. (a)(4), 288a, subd. (c)(2)) and two counts of committing lewd or lascivious acts on a child by force, violence, duress, menace, or fear of immediate and unlawful bodily injury (Pen. Code, § 288, subd. (b)(1)). The trial court imposed a six-year determinate prison sentence and an indeterminate term of 15 years to life, to be served consecutively.

On appeal, defendant argues the trial court abused its discretion by (1) denying his request to admit statements he made during pretext calls as prior consistent statements (Evid. Code, § 791);[1] (2) admitting evidence of uncharged sexual offenses (§ 1108); and (3) denying his motion for a mistrial after a trial witness referred twice to his having been incarcerated. He also contends those errors were cumulatively prejudicial. Finding no abuse of discretion or other error by the trial court, we will affirm the judgment.

---

[1] Unspecified statutory references are to the Evidence Code.

## I.   TRIAL COURT PROCEEDINGS

According to testimony from witnesses at defendant's second trial, defendant lived at a house in San José owned by Gail.[2]  Gail's daughter, Gina, and Gail's granddaughter, Ashley (born in June 1992), also lived at the house for two or three years in the late 1990's.

### A. ASHLEY'S ALLEGATIONS

Ashley testified that defendant inappropriately touched her on four occasions when she was between four and six years old.  During the first incident, Ashley testified that she and defendant were in a garage attached to Gail's house.  Ashley did not remember Gina being home, and she testified that Gail was home but was not in the garage.  Ashley said defendant pulled her pants down by her feet while she was standing, and he put his fingers into her vagina.  Ashley did not recall whether defendant said anything to her during the incident.

The second incident occurred about a week after the first.  Ashley said she was washing her hands after using the upstairs bathroom at Gail's house when defendant walked in, started urinating, and asked Ashley to hold his penis while he urinated, which she did.  Defendant eventually left the bathroom.  Gina was not home during this incident, but Gail was downstairs.

 During the third incident, which happened about a week after the second, Ashley said defendant put his fingers in her vagina while they stood on a staircase inside Gail's house.  This incident lasted about five minutes.  Gina was not home.  Gail was home but "[p]robably downstairs cooking."

The fourth incident occurred in the garage about a week after the third incident.  Ashley said she and defendant were alone in the garage during the day when defendant

---

[2]  Defendant's first trial ended in a hung jury, leading to a mistrial.  At the second trial, the victim, her family, and one other witness were referred to solely by their first names.  We will do the same.

put his finger into Ashley's vagina. Ashley's shirt was on and her pants were either "all the way down or just pulled down a little bit." Ashley testified that defendant either told her to put her mouth on his penis or put his penis into her mouth. Defendant's penis was erect and semen came out at the end, which Ashley remembered seeing on the floor. Ashley testified that defendant's penis was circumcised.

Ashley did not disclose defendant's conduct to anyone until she was 16 years old. She first told her boyfriend Daniel by text message. She explained that she was motivated to disclose defendant's misconduct by learning from Gina that one of her (Ashley's) cousins had been sexually assaulted. Ashley then sent Gina a text message asking her to come home early from work. When Gina returned home, Ashley showed Gina the text messages she had sent to Daniel. Gina called the police. Thereafter, San José Police Officer Joseph Martin came to interview Ashley at her house.

Officer Martin referred the matter to San José Police Detective Monica De la Cerda, who interviewed Ashley and arranged two pretext calls to defendant in February 2008.[3] During the first call, Ashley told defendant she was depressed and asked to talk about what he did to her when she was younger. Defendant repeatedly denied doing anything to Ashley, told her he did not know what she was talking about, and eventually ended the phone call after telling her he was busy. Ashley made a second pretext call to defendant the same day. Defendant again told Ashley he did not know what she was talking about and hung up on her a short time later.

Defendant waived a preliminary hearing. He was held to answer and was charged by felony information in July 2008 with one count of aggravated sexual assault of a child (Pen. Code, §§ 269, subd. (a)(4), 288a, subd. (c)(2)) based on the oral copulation

---

[3] Detective De la Cerda explained that a "pretext phone call is a monitored phone call in which the conversation is being recorded between the suspect and usually, in these cases, the victim and [the police are] monitoring the phone call." The contents of the pretext calls were not admitted into evidence at trial. We rely on the verbatim transcriptions of the pretext calls contained in the Clerk's Transcript.

allegation, and three counts of committing lewd or lascivious acts on a child by force, violence, duress, menace, or fear of immediate and unlawful bodily injury (Pen. Code, § 288, subd. (b)(1)) based on the other three incidents.

## B. SECTION 402 HEARINGS REGARDING SECTION 1108 EVIDENCE

Defendant moved in limine before the first trial to exclude evidence the prosecution sought to introduce under section 1108 regarding uncharged sexual offenses allegedly committed by defendant. He argued the section 1108 evidence was substantially more prejudicial than probative. The court held a section 402 hearing prior to the first trial. That hearing is relevant to this appeal because the judge in the second trial relied on testimony from the first hearing to resolve defendant's renewed motion.

At the first section 402 hearing, a woman named Erica testified that defendant was related to her father and lived with her family in her father's house in 1982 or 1983, when she was six or seven years old. Erica said defendant molested her three times while she lived at her father's house. She claimed that after those incidents, she had completely blocked out memories of the incidents. But she said that defendant's misconduct "started to come back" to her when she was around 12 years old when she had witnessed defendant trying to choke her mother, at which point she had told her mother and a friend about the prior incidents. Erica's allegations were reported to the authorities, but Erica was informed that the applicable statute of limitations barred prosecution of defendant. Erica testified that although she had blocked out the memories for several years, she always "knew there was something wrong." Now that the memories had come back to her, they were "vivid" and she remembered them "very clearly."

Dr. Richard Ofshe testified at the first section 402 hearing as an expert in the area of "pseudo-memories created by influence." He opined that the theory that a memory could be repressed entirely and then subsequently recovered had never been scientifically validated. He also stated that the memories people seemingly recover are likely pseudo-memories, which he defined as "piece[s] of information, if you will, that people

4

categorize as a memory and sincerely believe to be a memory but, in fact, [are] the product of influence." Dr. Ofshe explained that the repressed memory concept became a "popular myth" in the late 1980's and early 1990's before being discredited. He also stated that the most common cause of influence is through a "relaxation-induced apparent hypnotic state where the person believes that they are gaining access to information that they otherwise can't ordinarily access."

Dr. Ofshe also testified that a person's statement that his or her memory had been blocked out entirely and then subsequently recovered is a warning sign that a person is recalling a pseudo-memory rather than a genuine memory. He explained that describing something as being blocked out is another way of referring to a memory being repressed in response to a traumatic event, a concept he claimed was considered "100-percent speculative nonsense" by the scientific community. He said that even after a traumatic experience, "[y]ou may not like to think about it. You may want to avoid it. But, if somebody asks you" about it, "the answer will be, if it happened, yes, because you never forget it." When provided a hypothetical fact pattern based on Erica's testimony, Dr. Ofshe stated that he would be "very concerned" that those memories were pseudo-memories "because there's no reason to believe that normal human memory works this way."

Defendant renewed his motion in limine to exclude Erica's testimony before his second trial. The trial court reviewed the transcript from the prior section 402 hearing, heard argument from counsel, and concluded that both Erica and Dr. Ofshe would be permitted to testify at trial. The court found Erica's testimony "very probative" of whether defendant had a propensity to engage in lewd acts with children, particularly because Erica's allegations were similar to Ashley's regarding the type of misconduct alleged and the ages of the victims. The court reasoned that the jury should be allowed to hear the evidence to allow it to resolve defendant's arguments about the accuracy of Erica's testimony as well as the prosecution's challenges to Dr. Ofshe's testimony.

5

## C. TRIAL

*Ashley's Testimony* – At defendant's second trial, Ashley testified on direct examination consistent with the allegations set forth above. Through questioning of Ashley and other witnesses, defense counsel identified potential inconsistencies in Ashley's story. The first police officer to interview Ashley (Officer Martin), for example, testified that Ashley reported only three incidents to him and that she alleged that all of them involved digital penetration by defendant as well as defendant forcing Ashley to orally copulate him. She also told Officer Martin that she did not see semen on the floor after any of the incidents.

*Detective De la Cerda's Testimony* – Former San José Police Detective Monica De la Cerda, who interviewed Ashley twice in early 2008, testified that Ashley told her about three incidents (two in the garage and one upstairs in the bathroom). De la Cerda recalled asking Ashley to verify her report to Officer Martin that defendant had placed his penis in her mouth during the bathroom incident. Ashley told De la Cerda "she didn't remember that actually happening." Consistent with her prior statements, however, Ashley told De la Cerda that defendant was circumcised.

*Gina's Testimony* – Ashley's mother Gina testified about living at Gail's house with defendant. Early in the prosecutor's direct examination, he asked Gina how long defendant had lived at Gail's house. She responded: "Since I turned 16 and I'm 38 now. Up until he was incarcerated." Defense counsel immediately objected to Gail's reference to defendant's incarceration but did not move to strike the answer. The trial court sustained the objection. Shortly thereafter, the prosecutor asked Gina when she learned that her niece had been sexually assaulted. Gina responded: "I don't recall the year, but it was in December. It was actually before the incarceration of that previous December." Defense counsel once again objected to Gina's reference to defendant's incarceration. This time, however, the trial court held a bench conference. Defense counsel argued that

6

references to defendant's incarceration were prejudicial to defendant. The prosecutor agreed to advise Gina not to make further references to defendant's incarceration.

Defense counsel later moved for a mistrial outside the presence of the jury, arguing that Gina's two references to defendant's incarceration prejudiced his case. The trial court denied defendant's motion, reasoning that the references were "in passing," the jury had received instructions regarding the presumption of innocence, and the jury would hear those instructions again before their deliberations. We note that it is not clear whether Gina was referring to defendant's then-current custody status or his incarceration for a previous criminal conviction.

*Erica's Testimony* – Erica testified to three incidents of sexual abuse that occurred while defendant lived at her house in the early 1980's when she was around six or seven years old. On one occasion, defendant put his hand inside Erica's vagina while they were sitting on a sofa. In a second incident, defendant came into Erica's bedroom while she was lying in bed, pulled her underwear down, and licked her vagina. During a third incident, defendant called Erica into his bedroom where he was masturbating. Defendant asked Erica to come closer, but she refused.

Erica stated that she blocked out memories of those three incidents for a number of years but eventually remembered them when she was around 12 years old. She stated that she did not attend any therapy sessions with a psychologist or other mental health professional to discuss the incidents.

*Dr. Ofshe's Testimony* – Dr. Ofshe testified at trial about pseudo-memories, consistent with his statements during the first section 402 hearing. He said he had reviewed Erica's trial testimony and opined that her testimony was consistent with someone who has been influenced to create pseudo-memories. He pointed to Erica's use of the phrase "blocked out" and the concept that her memories came back at some point in response to a trigger. Dr. Ofshe acknowledged during cross-examination that Erica had denied attending therapy sessions during which she might have been influenced to

7

create pseudo-memories, but he stated it was possible Erica had learned about and been influenced by the concept of repressed memories through popular culture, given its pervasiveness in the 1980's and 1990's.

*Defendant's Testimony* – Defendant testified and steadfastly denied inappropriately touching Ashley. In contrast to Ashley's testimony, defendant stated that his penis was uncircumcised. On cross-examination, the prosecutor asked defendant whether he had hung up on Ashley during the second pretext call. He acknowledged that he had. Defendant also confirmed that he had reviewed a police report. And he acknowledged, in response to further questioning by the prosecutor, that he did not immediately tell Gail, Gina, or Gina's husband Sean about Ashley's allegations after the pretext calls. Nor did he disclose the allegations to Gail until about four days later.

After defendant's cross-examination, defense counsel moved to admit defendant's statements during the pretext calls as prior consistent statements (§ 791). The court denied the motion.

## D. JURY INSTRUCTIONS, VERDICT, AND SENTENCING

*Jury Instructions* – Among the instructions given to the jurors before deliberations began, the court admonished them not to "be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial." The jurors were also told that defendant was presumed to be innocent and that the prosecution had to prove his guilt beyond a reasonable doubt. Regarding Erica's testimony, the court instructed the jurors they could consider evidence of the uncharged crimes "only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offenses." If the jurors believed the prosecution satisfied that burden, the court further instructed them that the uncharged crimes evidence could be used to determine "that the defendant was disposed or inclined to commit sexual offenses," but they should not consider the evidence for any other purpose. The instruction made clear

8

that the uncharged crimes evidence "is not sufficient by itself to prove that the defendant is guilty" of the allegations relating to Ashley.

*Verdict and Sentencing* – The jury found defendant guilty of one count of aggravated sexual assault of a child (Pen. Code, §§ 269, subd. (a)(4), 288a, subd. (c)(2)) and two counts of committing lewd or lascivious acts on a child by force, violence, duress, menace, or fear of immediate and unlawful bodily injury (Pen. Code, § 288, subd. (b)(1)). The jury could not decide whether defendant was guilty of the Penal Code section 288, subdivision (b)(1) count related to the stairway incident, which count was later dismissed. The trial court sentenced defendant to 15 years to life in prison for aggravated sexual assault of a child. Defendant also received a consecutive six-year determinate sentence consisting of two three-year low-term sentences for the two lewd and lascivious acts on a child by force, violence, duress, menace, or fear of immediate and unlawful bodily injury.

## II.    DISCUSSION

### A. DEFENDANT'S PRETEXT CALL STATEMENTS (EVID. CODE, § 791)

Defendant argues the trial court erred by denying his request to admit his pretext call statements denying Ashley's allegations. He contends those statements were admissible as prior consistent statements under section 791, subdivisions (a) and (b). We review a trial court's evidentiary decisions for an abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 725 (*Waidla*).)

#### 1.  Section 791, Subdivision (a)

Prior consistent statements by a witness that would otherwise be inadmissible to support his or her credibility are admissible after evidence "of a statement made by him [or her] that is inconsistent with any part of his [or her] testimony at the hearing has been admitted for the purpose of attacking his [or her] credibility, and the statement was made before the alleged inconsistent statement." (§ 791, subd. (a).) Defendant contends that two statements elicited by the prosecutor on defendant's cross-examination were

9

inconsistent statements introduced to attack his credibility: that defendant hung up on Ashley to end the second pretext call, and that defendant did not immediately tell Gail, Gina, or Sean about Ashley's allegations after receiving the pretext calls.

### a. Hanging Up on Ashley

During cross-examination, the prosecutor asked defendant whether he had hung up on Ashley during the second pretext call. Defendant acknowledged that he had. He now asserts that acknowledging that he had hung up on Ashley "constituted an adoptive admission which supported a reasonable inference that [his] abrupt termination of the call manifested a belief in the truth of Ashley's accusations." (Citing *In re Jordan R.* (2012) 205 Cal.App.4th 111, 136 (*Jordan R.*).) We conclude this evidence was not an attack on defendant's credibility.

As noted earlier, defendant argues the evidence at issue constituted an adoptive admission. But the prosecutor did not argue that defendant had made an adoptive admission by hanging up on Ashley. In fact, the record shows the prosecutor explicitly promised (outside the presence of the jury), "I will not argue adoptive admissions." Furthermore, while evidence that defendant hung up on Ashley might support an inference of guilt, section 791 does not create an exception relating to guilt. It applies only to evidence that is admitted "for the purpose of attacking [a witness's] *credibility* ... ." (§ 791, subd. (a), emphasis added.)

Defendant relies on *Jordan R.* In that case, a Welfare and Institutions Code section 300, subdivision (d) petition was filed regarding father Carlos and his daughter Jordan, alleging that Jordan was at substantial risk of sexual abuse by Carlos. (*Jordan R.*, *supra*, 205 Cal.App.4th at pp. 115-117.) The petition was based on allegations that Carlos had sexually abused his niece. As part of that investigation, the niece had made a pretext call asking Carlos whether she should tell someone what had happened. Carlos hung up on his niece. (*Id.* at pp. 116-117.) The appellate court affirmed the dispositional order removing Jordan from Carlos's custody. (*Id.* at p. 136.) The court found that the

10

record supported the trial court's determination that Carlos had made an adoptive admission by hanging up on his niece during the pretext call without denying her allegations. (*Ibid.*)

*Jordan R.* is distinguishable. The evidentiary issue in that case did not involve Evidence Code section 791. And unlike *Jordan R.*, the prosecutor in this case did not argue that defendant had made an adoptive admission by hanging up on Ashley. The trial court here could therefore reasonably have concluded that the jurors would not have construed defendant's act of hanging up on Ashley as a statement attacking defendant's credibility. We thus conclude the trial court did not abuse its discretion by denying defendant's request to admit his pretext call statements.

### b. Delayed Disclosure of Pretext Call Allegations

Defendant next argues the prosecutor opened the door for admission of the pretext call statements by asking him questions intended to make him admit that he did not immediately tell Gail, Gina, or Sean about Ashley's allegations.

Evidence that defendant did not immediately disclose the pretext call allegations to the others was arguably admitted for the purpose of attacking his credibility. But defendant fails to show that acknowledging the delayed disclosure was "inconsistent with" his testimony denying the allegations. (§ 791, subd. (a) [prior consistent statement admissible only after "[e]vidence of a statement made by him [or her] that is inconsistent with any part of his [or her] testimony at the hearing has been admitted for the purpose of attacking his credibility"].) Contrary to defendant's argument, acknowledging that he did not immediately tell others about Ashley's allegations is not *inconsistent with* his statements denying Ashley's allegations. In other words, even if defendant delayed in disclosing the pretext calls to Gail, Gina and Sean, he *consistently* denied the allegations underlying the pretext calls. We therefore find no abuse of discretion in the trial court's denial of defendant's request to admit the pretext call statements on this ground.

11

## 2. Section 791, Subdivision (b)

Defendant also argues that his pretext call statements should have been admitted under section 791, subdivision (b) because the prosecutor impliedly charged that defendant had recently fabricated his testimony by eliciting testimony that he had read a police report related to the allegations against him.  Prior consistent statements by a witness that would otherwise be inadmissible to support a witness's credibility are admissible when offered after an "express or implied charge has been made that his [or her] testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."  (§ 791, subd. (b).)

At the beginning of the prosecutor's cross-examination, the prosecutor asked defendant:  "Prior to coming to court today, at any point in the last five years, have you read any of the police reports in this case?"  Defendant responded:  "Well, like, the police report, I ended up finally reading it about three years later."  The prosecutor also asked defendant whether he had been provided with "any of the transcripts of [other] people's interviews with the police or their testimony in court."  Defendant stated that he did not understand the question.  The prosecutor then asked:  "What else have you read about this case in the last five years?"  Defendant responded:  "Nothing."  After those questions, the prosecutor proceeded to question defendant about his interactions with Gail when he lived at Gail's house.

Defendant contends the foregoing questions "unmistakably conveyed the implication that [defendant had] fabricated his testimony in a manner tailored to meet both the testimony contained in transcripts and the investigative reports of the police."  But nothing in the prosecutor's cross-examination suggests the prosecutor was trying to imply that defendant was fabricating his testimony based on information he had read in a police report.  Indeed, the record shows that after asking these foundational questions, the prosecutor immediately moved on to unrelated questions about defendant's interactions

12

with Gail. For this reason, we conclude the trial court did not abuse its discretion by denying defendant's request to admit his pretext call statements as prior consistent statements under section 791, subdivision (b).

## B. ERICA'S TESTIMONY (EVID. CODE, § 1108)

Defendant challenges the admission of Erica's testimony about uncharged sexual offenses allegedly perpetrated by defendant in the 1980's. Section 1101 generally excludes "evidence of a person's character or a trait of his or her character ... when offered to prove his or her conduct on a specified occasion." (§ 1101, subd. (a).) But section 1108 contains an exception to that general rule, stating that in "a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (§ 1108, subd. (a).) Section 352 provides trial courts discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.)

When determining whether to admit evidence under section 1108, a trial court must consider the so-called *Falsetta* factors. Those factors include the prior conduct's "nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*People v. Falsetta* (1999) 21 Cal.4th 903, 917 (*Falsetta*).) We review a trial court's decision to admit evidence under section 1108 for an abuse of discretion. (*People v. Loy* (2011) 52 Cal.4th 46, 61.)

13

At the first section 402 hearing, Erica testified that defendant molested her three times over a one-year period in the early 1980's while he lived with Erica's family. Erica stated that she had forgotten and blocked out what defendant did to her for a number of years, but her memories came back when she was 12 or 13 years old. Dr. Ofshe also testified at the first section 402 hearing, offering his expert opinion that Erica's testimony about her retrieved memories was inconsistent with what experts understand about memory formation and retention.

Defendant argues there was a low degree of certainty that he had molested Erica based on the "strong evidence" from Dr. Ofshe's testimony that Erica's memories were merely pseudo-memories, meaning it was unlikely the alleged molestation of Erica had actually occurred. Defendant also argues that Erica had a motive to lie about the allegations because she did not disclose the alleged molestation until after defendant tried to choke her mother.

We conclude that although Dr. Ofshe's testimony called into question whether the uncharged offenses occurred, the trial court could reasonably have determined that Erica's testimony was sufficiently credible and similar to the charged offenses to allow her to testify. In other words, the court exercised its discretion to allow the jury to decide the weight to give Erica's testimony giving due consideration to Dr. Ofshe's expert testimony about pseudo-memories. This was not an abuse of its discretion.

Defendant next contends that Erica's allegations were too remote in time. "Remoteness of prior offenses relates to the 'the question of predisposition to commit the charged sexual offenses.' " (*People v. Branch* (2001) 91 Cal.App.4th 274, 285 (*Branch*).) A substantial gap between the prior offenses and the charged offenses reduces the likelihood that a defendant had a propensity to commit the charged offenses and factors against admissibility. But significant similarities between the charged offenses and the prior offenses can balance out remoteness. (*Ibid.*)

14

Defendant notes that the uncharged conduct was alleged to have occurred 28 or 29 years before defendant's first section 402 hearing.  Also relevant is the period between the uncharged conduct and that of the charged offense.  Erica's testimony at the section 402 hearing disclosed that the uncharged conduct occurred in 1982 or 1983.  The felony information alleged that defendant molested Ashley in 1999, meaning the period between Erica's and Ashley's allegations was 16 or 17 years.  While this time period does not favor admission of the evidence, it is also not so remote as to compel exclusion of it.  The amount of time between the alleged incidents affects the weight of the evidence, not its admissibility.  As the People note, courts have upheld the admission of section 1108 evidence despite longer time gaps.  (Citing *Branch*, *supra*, 91 Cal.App.4th at pp. 284-285 [30-year time gap]; *People v. Pierce* (2002) 104 Cal.App.4th 893, 900 [23-year gap].)

The similarities between the uncharged conduct and the charged offenses weigh in favor of admission of the uncharged conduct.  Ashley and Erica were both around six or seven years old and living in a house where defendant also lived when the alleged misconduct occurred.  Both alleged digital vaginal penetration by defendant.  Though their allegations differed in other respects, those significant similarities support the trial court's decision to admit Erica's testimony.

Defendant claims that admitting Erica's testimony created a high likelihood of confusing, misleading, or distracting jurors because the evidence was subject to a different standard of proof (preponderance of the evidence), and because the presentation of supporting testimony would be unduly time-consuming.  But those risks are present whenever evidence of uncharged sexual offenses is introduced under section 1108.  Defendant has not demonstrated anything exceptional or unusual about his case to compel a finding that the trial court abused its discretion.

Defendant contends he was placed under an "impossible burden" to defend Erica's allegations given the substantial time gap since those incidents occurred and the lack of corroborating evidence to support them.  But defendant was free to confront and cross-

examine Erica during trial and was also allowed to elicit expert testimony from Dr. Ofshe to cast doubt on the accuracy of Erica's recollection.

Finally, defendant argues that because he was never convicted of any crime associated with Erica's allegations, evidence of those incidents was inherently prejudicial and should have been excluded. While that factor weighs against admissibility, when reviewed along with the other *Falsetta* factors, we find no abuse of discretion in the trial court's decision to allow both Erica and Dr. Ofshe to testify about the uncharged conduct.

## C. GINA'S STATEMENTS ABOUT DEFENDANT'S INCARCERATION

Finally, defendant argues that the trial court erred by not declaring a mistrial after Gina made two references to defendant's incarceration during her trial testimony. "A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling denying a mistrial." (*People v. Silva* (2001) 25 Cal.4th 345, 372.)

As noted earlier, when the prosecutor asked Gina how long defendant lived at Gail's house, Gina responded: "Since I turned 16 and I'm 38 now. Up until he was incarcerated." Defense counsel immediately objected, the trial court sustained the objection, and defense counsel did not move to strike the answer. A short time later, Gina stated that she found out her niece had been sexually assaulted "before the incarceration of that previous December." After defense counsel objected again, the trial court held a bench conference and the prosecutor agreed to advise Gina not to make further references to defendant's incarceration. No subsequent references to incarceration occurred.

Defendant compares his case to *People v. Allen* (1978) 77 Cal.App.3d 924 (*Allen*). In *Allen*, the prosecutor called a rebuttal witness to attack another witness's credibility. The rebuttal witness related the following hearsay statement: " 'she stated that [the defendant] was on parole and he couldn't stand another beef.' " (*Id.* at p. 934.) The trial

16

court struck the answer and admonished the jury to " 'disregard it completely, as if it were never said.' " (*Ibid.*) But rather than analyze the trial court's refusal to grant a mistrial for an abuse of discretion, the Court of Appeal apparently assumed the trial court erred, analyzed that error for *Watson* prejudice, and concluded it was reasonably probable the defendant would have achieved a more favorable result had the jury not heard about his parole status. (*Allen*, at p. 935, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) The *Allen* court also determined that the trial court committed reversible error by limiting the subject matter the defendant could use to attack the credibility of certain witnesses. (*Allen*, at pp. 938, 929, 932-934.)

To the extent defendant contends *Allen* stands for the proposition that it is an abuse of discretion—per se—to deny a mistrial in any case where a defendant's previous incarceration or custody status is disclosed to the jury, we disagree. As *People v. Bolden* (2002) 29 Cal.4th 515 (*Bolden*) demonstrates, a fleeting reference to a defendant's previous incarceration does not compel a trial court to grant a mistrial. In *Bolden*, a police officer testified that the defendant's present address was " 'the Department of Corrections parole office ... .' " (*Bolden*, at p. 554.) The trial court denied the defendant's motion for a mistrial and the Supreme Court found no abuse of discretion, reasoning it was "doubtful that any reasonable juror would infer from the fleeting reference to a parole office that defendant had served a prison term for a prior felony conviction" and that the "incident was not significant in the context of the entire guilt trial ... ." (*Id.* at p. 555.)

We likewise find no abuse of discretion here. Gina made two fleeting references to incarceration at the beginning of her testimony, and she did not make any additional references following the bench conference. The trial court sustained defendant's objection to Gina's first reference to incarceration. Defendant points to no statements by the prosecutor suggesting that the jurors should infer defendant's guilt or a predisposition for criminality based on Gina's statements. Also, the jury was instructed before

17

deliberating to "not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial." The jury was also instructed that defendant was presumed to be innocent. For these reasons, the fleeting references to defendant's incarceration did not irreparably damage defendant's chance of receiving a fair trial. We thus conclude the trial court did not abuse its discretion in denying the motion for mistrial.

### D. CUMULATIVE ERROR

As we found no error, defendant's cumulative error argument also fails.

## III. DISPOSITION

The judgment is affirmed.

_____
Márquez, J.

WE CONCUR:

_____
Rushing, P. J.

_____
Premo, J.